**Paul Joseph "Jay" KELLEY, III, Appellant,**

v.

**Daniel T. TANOOS, Appellee.**

No. 84A01–0410–CV–461.

Court of Appeals of Indiana.

Aug. 18, 2005.

Publication Ordered Dec. 27, 2005.

Opinion on Rehearing Jan. 4, 2006.

John R. Price, John R. Price & Associates, Indianapolis, for Appellant.

Robert B. Clemens, George T. Patton, Jr., Bryan H. Babb, Bose McKinney & Evans LLP, Indianapolis, for Appellee.

## OPINION

ROBB, Judge.

Plaintiff Paul Joseph "Jay" Kelley, III appeals from the trial court's order granting summary judgment to defendant Daniel T. Tanoos. We reverse and remand for trial.

### Issue

Kelley raises multiple issues for our review, which we consolidate and restate as whether the trial court appropriately granted summary judgment.

### Facts and Procedural History

Tanoos was Superintendent of the Vigo County School Corporation. On January 17, 2001, he was eating dinner with his family at their kitchen table when someone fired a twelve gauge shotgun at him from outside the home. The deer slug went through the sliding patio door and grazed Tanoos' head. Tanoos lost some hair but was otherwise uninjured.

The police began investigating the crime, but an immediate arrest was not forthcoming. Kelley became a suspect. He had developed animosity for Tanoos arising out of Tanoos' treatment of Kelley's mother. Kelley's mother was a middle school principal under Tanoos. Because of performance issues, Tanoos removed Kelley's mother from her job as principal and then did not renew her contract the following school year. She unsuccessfully sued Tanoos and the school

corporation, among others. Kelley's dislike for Tanoos was no secret.

At the time of this incident, Kelley was Supervisor of Safety and Security at the Gibault School, a private school providing residential services for juveniles with educational or behavioral issues. James Sinclair was the Executive Director and Chief Executive Officer of Gibault, Inc. Sinclair testified that the day after the shooting the rumors were rampant on the Gibault campus that Kelley was a suspect. On January 28, 2001, Kelley was promoted to an interim directorship and told that the appointment would become permanent if he performed satisfactorily. In May and June 2001, following his identification as a suspect, the police came to Gibault School and interviewed some of Kelley's fellow employees. In July, 2001, Kelley was removed from his directorship and returned to his former job. After the police interviews at the school, Kelley's colleagues and superiors treated him with distrust. Kelley felt like he had no future at Gibault and ultimately resigned his employment as a result.

Meanwhile, sometime later that summer, the police contacted Gibault and indicated that they would like to speak to some of the Gibault employees again. Gibault's human resources director declined to allow the police to interview the employees again on company time, indicating that they could be interviewed on their own time. This led to a pervasive rumor in town that Gibault was not cooperating with the police investigation. This, in turn, seemed to spawn strained relations between Vigo County School Corporation and Gibault School. Sinclair was concerned about this since Gibault students often attended Vigo County schools.

Sometime toward the end of the year, Sinclair sent Tanoos a letter congratulating him on winning an award. Sinclair also suggested the two get together. Tanoos called Sinclair and they set up a lunch. Tanoos then went to the police and told them about the meeting, indicating that Kelley and his involvement with the crime would be a topic of conversation. The police gave Tanoos a few questions to ask, and a wire to wear so that the conversation could be recorded. The meeting occurred on or about December 21, 2001.

Tanoos played amateur detective and tried to coax information from Sinclair. In doing so, he made the following statements about Kelley:

"I'm as convinced as the police are that Jay Kelley did it."

"Well, the issue with the polygraph is that he took it four times and failed it three times."

"It's all circumstantial, but it all leads back to him."

"He—I could throw you on to some other people the police looked at through different things and all—all of a sudden all the things they were hearing—everything just started pointing to him."

Appellant's Appendix at 428, 432, 438, 445.

Kelley was never charged with any crime arising from the attempted shooting of Tanoos. A man by the name of Marty Ketner, who did not become a suspect until around February, 2002, was tried and acquitted of Tanoos' attempted murder.

Kelley filed this lawsuit for defamation against Tanoos on December 10, 2002. Following discovery, the parties filed cross-motions for summary judgment. After a hearing, the trial court granted Tanoos' motion, without findings or conclusions, and denied Kelley's. Kelley now appeals.

*Discussion and Decision*

I. Standard of Review

Our standard of review is the same as the trial court's when reviewing a grant of

summary judgment. *Embry v. O'Bannon,* 798 N.E.2d 157, 159 (Ind.2003). Summary judgment is appropriate only where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id.* We consider only those facts that the parties designated to the trial court. *St. Joseph County Police Dep't v. Shumaker,* 812 N.E.2d 1143, 1145 (Ind.Ct.App.2004). We do not reweigh the evidence; instead, we liberally construe the designated evidence in the light most favorable to the nonmovant to determine whether a genuine issue of material fact exists. *Id.* We may affirm the grant of summary judgment upon any basis argued by the parties and supported by the record. *Rodriguez v. Tech Credit Union Corp.,* 824 N.E.2d 442, 446 (Ind.Ct.App. 2005).

## II. Summary Judgment Improper Because of Genuine Issues of Material Fact

### A. Elements of Defamation

■ Kelley contends he came forward with evidence that, at the very least, raises an issue of fact on each element of his defamation claim. There are four elements to a defamation claim: defamatory imputation, malice, publication and damages. *Glasscock v. Corliss,* 823 N.E.2d 748, 753 (Ind.Ct.App.2005). Publication is not at issue in this case because Tanoos concedes that there was publication. We address the remaining elements in turn.

### 1. Defamatory Imputation

■ "A communication is defamatory *per se* if it imputes criminal conduct." *Id.* Kelley claims that the statements by Tanoos to Sinclair accuse Kelley of the crime of attempted murder. Tanoos responds that the statements were simply rhetorical hyperbole, not really asserting anything and incapable of being proved true or false. We agree with Kelley.

The recent case of *Glasscock v. Corliss* is instructive. In that case, Corliss worked for Décor Gravure, and was terminated. Décor later sued Corliss, and Corliss filed a counterclaim and also sued, by third party complaint, Décor's president Glasscock for defamation. Glasscock moved for summary judgment on the defamation claim. Corliss' only evidence showed that Glasscock said in a company meeting that Corliss "had been fired due to 'discrepancies in her expense report'" and for buying gifts for her family and friends. 823 N.E.2d at 753. We concluded that although the statements did not explicitly accuse Corliss of a crime, in context they implied that Corliss had committed the crime of theft. We held that summary judgment had been correctly denied.

Similarly, here, Tanoos' statements may not explicitly accuse Kelley of attempted murder. But taken in the context of the meeting and discussion between Sinclair and Tanoos, the statements clearly imply that Kelley was guilty of the crime. "'If the words were calculated to induce the hearers to suspect that the plaintiff was guilty of the crime, they were actionable ...'" *Street v. Shoe Carnival, Inc.,* 660 N.E.2d 1054, 1059 (Ind.Ct.App.1996) (quoting *Drummond v. Leslie,* 5 Blackf. 453, 455 (Ind.1840)). We therefore find as a matter of law that Tanoos' statements were defamatory *per se.*

### 2. Malice

■ To prevail, a plaintiff must show, by clear and convincing evidence, that a defamatory statement was made with malice. *Poyser v. Peerless,* 775 N.E.2d 1101, 1107 (Ind.Ct.App.2002). Malice may be shown by proof that publication was made with knowledge of its falsity or with a reckless disregard of whether or not it was false. *Id.* Where the defendant harbors serious doubts as to the truth of her publi-

cation, we will find that she acted with a reckless disregard. *Id.*

Kelley claims that Tanoos has testified that he knew the statements were false when made, or that at least his testimony shows he did not care whether they were true or false. Tanoos testified at Ketner's trial: [1]

> Q. All right. Did you become convinced after the shooting that Jay Kelley was the one who shot you?
>
> A. No.
>
> . . .
>
> Q. Okay, did you provide information to [the police] about any reason or motive [Kelley] might have to want to participate in the shooting?
>
> A. No, I wouldn't have had a reason to believe that he was involved.
>
> . . .
>
> Q. Do you recall telling Mr. Sinclair during the conversation: "I'm convinced from all that I've seen and heard it was him."
>
> A. I don't recall that statement, I may have tried to get him to say something at that point and use that statement, I don't recall that.
>
> Q. Okay, so you are saying that you may have said that?
>
> A. I may have, I don't recall.
>
> Q. You [m]ay have said it, but you didn't believe it?
>
> A. My point at that time again was to try to—as I met with the police they asked me to ask certain questions to try to see why he wanted to meet with me and see what information he had, so I was going on what the police had asked me to do.
>
> Q. So, were you telling Mr. Sinclair false things or things that you didn't

believe, trying to act as some sort of informant or interviewer?

> A. I was trying to find out why he wanted to meet with me and what he had to offer for the meeting that he had asked me to attend.

Appellant's App. at 497, 498, 502–03. Further, Sinclair testified that after his meeting with Tanoos, he was left with the impression that Tanoos wanted him to fire Kelley. We believe this evidence would certainly allow, though not compel, the fact-finder to reasonably conclude that Tanoos acted with malice. Tanoos reads the evidence differently, but this simply highlights the existence of a genuine issue of fact. The evidence proffered by Kelley is enough to raise a question of fact as to whether Tanoos made the defamatory remarks with malice.

### 3. Damages

■ Upon proof of defamation *per se,* damages are presumed. *Glasscock,* 823 N.E.2d at 757. In fact, substantial damages may be awarded a plaintiff even absent any proof. *Id.* Tanoos acknowledges the presumption, but contends that he has rebutted the presumption as a matter of law.

■ We agree with Tanoos that the evidence of record overwhelmingly supports his contention that Kelley was not damaged. The publication was limited to essentially one person, Sinclair. Sinclair already knew Kelley was a suspect in the attempted murder, and in fact had questioned Kelley several times about his involvement. Kelley testified that he resigned his employment because of how he was treated after the police came to Gibault's campus and interviewed his fellow employees, an event that occurred many months before Tanoos' meeting with Sin-

---

1. The instant lawsuit was pending at the time of Ketner's trial.

clair. And there is no evidence in the record that Sinclair took any adverse employment action against Kelley after the meeting. In fact, there is simply no evidence in the record that Kelley sustained any damages at all.

 Nonetheless, we must decline Tanoos' invitation to grant summary judgment on this basis, because we do not believe that the presumption can be rebutted as a matter of law at the summary judgment stage.[2] "A presumption is an assumption of fact resulting from a rule of law that requires the fact to be assumed from another proven fact or group of facts. Stated differently, a presumption is a declaration of public policy that if a litigant presents evidence of a specified set of facts, then an additional fact will be presumed to exist." 12 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE, INDIANA EVIDENCE § 301.101 (2d ed.1995). "Presumptions are simultaneously governed by [Indiana] Evidence Rule 301, case law, and statutes, therefore, 'this area of law is a nightmare.'" *Schultz v. Ford Motor Co.*, 822 N.E.2d 645, 653 (Ind.Ct.App.2005).

It appears that this issue is one of first impression. Rule 301 states:

> In all civil actions and proceedings not otherwise provided for by constitution, statute, judicial decision or by these rules, a presumption imposes on the party against whom it is directed the bur-

den of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of·nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast. A presumption shall have continuing effect even though contrary evidence is received.

The first sentence of Rule 301 advances the "bursting bubble" theory of presumptions. 12 MILLER, § 301.102. That is, the presumption disappears and ceases to have effect after evidence to dispute the presumed fact is produced. *Id.* This theory finds homage in numerous Indiana cases, both prior to and after the adoption of Rule 301. *See, e.g., Sumpter v. State,* 261 Ind. 471, 306 N.E.2d 95, 99 (1974) ("'When the opponent of the presumption has met the burden of production thus imposed, however, the office of the presumption has been performed; the presumption is of no further effect and drops from the case."'") (quoting *Young v. State,* 258 Ind. 246, 280 N.E.2d 595, 598 (1972)); *Schultz,* 822 N.E.2d at 654 ("'If the opponent produces evidence that rebuts the presumption, it serves no further purpose."'") (quoting *Cansler v. Mills,* 765 N.E.2d 698, 705 (Ind.Ct.App.2002)). But the second sentence of Rule 301, that the presumption shall have continuing effect, seems contradictory. How the presump-

---

**2.** Tanoos also encourages us to adopt the "libel-proof plaintiff" doctrine. A libel-proof plaintiff is an individual whose reputation among the audience to which the defamation was published was already so bad that it is virtually insusceptible to further damage. *Cerasani v. Sony Corporation,* 991 F.Supp. 343, 352 (S.D.N.Y.1998). Such a plaintiff is entitled to nominal damages at best, but for policy reasons no damages should be awarded. *Id.* Rather, the case should be dismissed so that the defendant will not have to incur the costs of defense. *Id.*

Although we agree that it certainly appears Kelley suffered at most nominal damages, we do not agree Kelley was libel-proof in this situation. Sinclair knew Kelley was a suspect in the shooting, but did not know Tanoos, the victim, believed Kelley "did it." Sinclair also did not know that the police believed that Kelley "did it." Thus, we cannot say as a matter of law that Kelley's reputation in Sinclair's eyes could not have been further damaged by Tanoos' statements. We decline to adopt the libel-proof plaintiff doctrine in this case.

tion can have continuing effect when it has burst is unclear. 12 MILLER, § 301.102. No Indiana cases have interpreted this apparent contradiction in Rule 301. What is clear: Rule 301 does not shift the burden of proof. *Id.*

Judge Robert Lowell Miller proposes that "a presumption met by rebutting evidence may effectively become an inference under Rule 301." *Id.* "An inference remains in the case despite the presentation of contrary proof and may be weighed with all the evidence." *Id.* We agree. This reading seems to harmonize the two sentences. It makes particular sense where, as here, the presumption is based primarily on "logical probabilities." *Id.* at § 301.101 (Inferences are always logical; presumptions may be logical or may be based on public policy, social convenience, safety or procedural convenience).

So despite the fact that Tanoos has come forth with significant evidence showing that Kelley was not damaged, Tanoos has not established an absence of damages as a matter of law. The presumption of damages converts to a reasonable inference that, being the victim of *per se* defamation, Kelley has been damaged. A genuine issue of material fact remains as to whether Kelley was damaged by the defamation.

## B. Tort Claims Act

▬▬ Tanoos contends that summary judgment should be affirmed because Kelley failed to comply with the Indiana Tort Claims Act. The Act provides that a lawsuit against a governmental employee acting within the scope of his employment will be barred unless notice is given pursuant to the Act within 180 days of the alleged tort. *Celebration Fireworks, Inc. v. Smith,* 727 N.E.2d 450, 451–52 (Ind.2000); Ind.Code § 34–13–3–8. Whether the Act applies in a given case is a question of law for the court. *See Peavler v. Bd. of Comm'rs of Monroe County,*

528 N.E.2d 40, 46 (Ind.1988). The burden of proving its applicability lies with the party seeking to claim its protections. *King v. Northeast Security, Inc.,* 790 N.E.2d 474, 480 (Ind.2003).

Because Kelley did not submit a tort claim notice, his claim is barred if the Act applies. In that regard, the issue presented by this appeal is whether Tanoos was acting within the scope of his employment at the time he made the defamatory statements. The preeminent case on this issue is *Celebration Fireworks v. Smith.* In that case, Smith was a city fire chief. George Kendall owned a motorcycle shop and was planning to rent space to Celebration. Smith went to the motorcycle shop on official business to conduct a fire inspection. In conversation with Kendall, Smith made a few brief allegedly defamatory statements like "these people don't pay their bills." Celebration sued Smith. Smith claimed his statements were made within the scope of his employment and the Tort Claims Act applied, barring the claim. Our supreme court agreed. The court first noted that "Smith was on public time, performing a function that was central to the position he held." *Celebration Fireworks,* 727 N.E.2d at 453. The court then declined to piece out the offending statements, finding that Smith's conversation with Kendall was "the act causing plaintiff's loss" and was in furtherance of his employer's interests. The court concluded that the Act applied and barred Smith's claim.

Tanoos does his best to portray his meeting with Sinclair as a professional one; a meeting that occurred because of their professional positions. Admittedly, Sinclair initiated the meeting for what appears to be purely professional reasons. But there are significant differences between the facts of this case and *Celebration Fireworks.* Here, the time, the lunch

hour, and the place, a restaurant, are neutral. And while Sinclair may have initiated the meeting for professional reasons, Tanoos' motivation for attending was primarily personal. He went to the police and consulted with them prior to the meeting. At the meeting, he acted like an undercover investigator. Educational matters were discussed, to be sure, but the essence of the meeting was Tanoos investigating his attempted murder. We do not believe that Tanoos has carried his burden of proving that the conversation with Sinclair was primarily in the service of his employer's interests. Accordingly, we find that the Indiana Tort Claims Act was not applicable to Kelley's claim.

### C. Qualified Privilege

#### 1. Common Interest

■■■ Indiana has a well-established common law privilege for "communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Schrader v. Eli Lilly and Co.*, 639 N.E.2d 258, 262 (Ind.1994). The court is to decide the privilege's applicability as a matter of law, unless the facts giving rise to it are in dispute. *Olsson v. Indiana Univ. Bd. of Trs.*, 571 N.E.2d 585, 588 (Ind.Ct.App.1991). The defendant has the burden of proving that she deserves the protections of the privilege. *See May v. Frauhiger*, 716 N.E.2d 591, 595 (Ind.Ct. App.1999).

■■■ Tanoos contends that he is entitled to claim the qualified privilege because Tanoos and Sinclair, as "education leaders," had a common interest in resolving the rift between the institutions that

had arisen because of the Kelley investigation and in identifying a potentially violent person working with their kids. Brief of Appellee at 20. As discussed above, section II.B., *supra*, the facts simply do not show that Tanoos was primarily motivated by either of these goals. Tanoos has failed to carry his burden; he is not entitled to the protections of the qualified privilege.

#### 2. Law Enforcement

■■■ Communications to law enforcement officers have been found to be qualifiedly privileged. *Conn v. Paul Harris Stores, Inc.*, 439 N.E.2d 195, 200 (Ind. Ct.App.1982). These communications are a somewhat well-defined subset of the common interest qualified privilege. The purpose of this privilege is to promote society's interest in having crimes reported. Tanoos' communications were to Sinclair, not a law enforcement officer, so this privilege is inapplicable on its face. Tanoos, however, encourages us to extend the privilege to "statements made on behalf of law enforcement authorities to third parties." Brief of Appellee at 23. We leave for another day whether such an extension of the law might be appropriate for the protection of someone like an undercover informant.[3] For we cannot accept Tanoos' characterization of his defamatory remarks as "statements made on behalf of law enforcement authorities to third parties." His relationship with the police in this case was just too tenuous; his motive too personal. To accept this characterization would be to accept that Tanoos was acting as an agent of the police. Tanoos may have been acting in concert with the police, but we are loath to conclude that he was acting as an agent.

**3.** We note, however, that such an extension would neither promote the underlying pur-

pose of the law enforcement privilege nor involve a common interest.

We hold that the law enforcement qualified privilege does not support the grant of summary judgment in this case.

### Conclusion

Tanoos' statements to Sinclair were defamatory *per se*. A genuine issue of material fact exists as to whether the statements were made with malice and whether, if so, Kelley was damaged as a result. The Indiana Tort Claims Act does not apply to Kelley's claim, so his failure to submit notice is not fatal. Finally, Tanoos cannot claim the protections of the common interest or the law enforcement qualified privileges. The trial court erred in granting summary judgment for Tanoos.

Reversed and remanded for trial.[4]

KIRSCH, C.J., and BAILEY, J., concur.

### ORDER

On August 18, 2005, the Court handed down its opinion in this appeal marked Memorandum Decision, Not for Publication. The Appellant, by counsel, has filed a Motion to Publish Memorandum Decision, Not for Publication, and the Appellee, by counsel, has filed his Joinder in Appellant's Motion to Publish Memorandum Decision. The parties agree that the Court's opinion dealt with significant issues of law regarding defamation in Indiana, and they move the Court to publish the opinion in this appeal.

Having considered the matter, the Court FINDS AND ORDERS AS FOLLOWS:

1. The parties' Motion to Publish Memorandum Decision is GRANTED, and this Court's opinion heretofore handed down in this cause on August 18, 2005, marked Memorandum Decision, Not for Publication is now ORDERED PUBLISHED.

All Panel Judges concur.

### OPINION ON REHEARING

ROBB, Judge.

Daniel Tanoos was sued by Paul Kelley for defamation and the trial court granted summary judgment in his favor. On appeal, we held that the trial court erred in granting summary judgment for Tanoos because a genuine issue of material fact existed as to whether Tanoos made his statements with malice and whether Kelley had been damaged. *Kelley v. Tanoos*, Cause No. 84A01–0410–CV–461, 840 N.E.2d 342 (Ind.Ct.App., Aug. 18, 2005). In holding there was a genuine issue of material fact regarding Kelley's damages, we relied upon the presumption of damages for defamation *per se*, and held that Tanoos' evidence that Kelley was not in fact damaged only converted the presumption of damages into a reasonable inference of damages, rather than establishing the absence of damages as a matter of law. Tanoos petitions for rehearing of our opinion.[1]

Tanoos first alleges that there is a factual error in our opinion. We stated, "Sinclair suggested [he and Tanoos] get to-

---

4. Tanoos' motion for appellate attorney fees is denied.

1. Tanoos subsequently made a submission of additional authority. Kelley then filed a response to that submission, claiming that the additional authority should be disregarded as irrelevant, and Tanoos filed a motion to strike Kelley's response. We allow the filing of additional authority where warranted, and al-though there is no rule prohibiting the filing of a response, allowing the submission of additional authority after briefing is not intended to open the case to further argument by either side. Nonetheless, we have given the additional authority the consideration it is due, and deny Tanoos' motion to strike Kelley's response.

gether. Tanoos called Sinclair and they set up a lunch. Tanoos then went to the police and told them about the meeting, indicating that Kelley and his involvement in the crime would be a topic of conversation." Op. at 346. Tanoos claims that he did not reach out to Sinclair until after he spoke with police. Our review of the record reveals that Tanoos is technically correct. Sinclair suggested lunch, Tanoos called the police, and the police told him that if Sinclair wanted to discuss school business, they were not interested. Tanoos contacted Sinclair, found out that Kelley would be a topic of discussion, and again contacted the police. Our recitation of the facts left out the initial conversation between Tanoos and the police. However, as the police did nothing more during that conversation than tell Tanoos they were only interested if Kelley was to be a subject of conversation, the omission does not affect our decision.

Substantively, Tanoos contends that our opinion reversing summary judgment and remanding for jury trial on an inference or presumption of damages does not represent sound public policy and that we should instead follow several other states that have abolished the presumption of damages in defamation cases.

Tanoos notes that none of the cases cited in our opinion deal specifically with the use of a presumption in a defamation case. We agree, and we specifically noted in our opinion that this was an issue of first impression. Thus, a review of the law of presumptions in other areas was both necessary and appropriate. Tanoos also notes that transfer has been granted by our supreme court on one of the cases we cited, thus vacating the opinion. *See Schultz v. Ford Motor Co.*, 822 N.E.2d 645, 653 (Ind.Ct.App.2005), *trans. granted* (Ind., Aug. 25, 2005). However, we note that we did not cite to *Schultz* for any

proposition novel to that case, and any statements attributed to *Schultz* are supported by other sources, as well.

Tanoos contends that our decision is not "sound public policy." Appellee's Petition for Rehearing at 5. However, as stated in our opinion, a presumption "is a declaration of public policy that if a litigant presents evidence of a specific set of facts, then an additional fact will be presumed to exist." Op. at 349 (quoting 12 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE, INDIANA EVIDENCE § 301.101 (2d ed.1995)). Thus, the public policy decision has already been made in establishing the presumption in the first place. Here, Kelley has shown the required set of facts—he has proven defamatory imputation and publication and he has raised at least a question of fact as to malice. Thus, damages can be presumed. That Tanoos has come forth with evidence rebutting the presumption of damages only converts the presumption of damages into a reasonable inference of damages that at trial will be considered with all other evidence. *See* 12 MILLER § 301.102. As Kelley is the non-movant, and all reasonable inferences are to be construed in his favor at the summary judgment stage, the grant of summary judgment for Tanoos was inappropriate.

Subject to the above clarifications, we reaffirm our original opinion in its entirety.

KIRSCH, C.J., and BAILEY, J., concur.